It's on the docket, too, that on June 18th, 1973, 17th, the people of the state of Illinois, Plainton, Papua New Georgia, is Brandon Lear Jones, defendant of Pebbles. I remain on behalf of the defendant of Pebbles, Mr. David W. Warchuk. I remain on behalf of the plaintiff of Papua New Georgia, Mr. Steven J. Lewis. Mr. Warchuk. You may proceed. Good morning, Your Honor. Counsel, my name is David Warchuk and I represent the defendant in this case, Brandon Jones. Our Constitution, specifically in relationship to criminal procedure, has safeguards in place to prevent what has been called the nightmare of the wrongfully accused being found guilty. In this case, some of the safeguards were not properly followed, and so we cannot be assured that the wrongfully accused was in fact not found guilty. There are several instances, several ways in which this happened. One is that the lineup identification in this case was done in an unnecessarily suggestive fashion that would bribe the defendant of his due process rights. Second, the complete misdoctrine as codified in Rule 106 was not properly applied so that the statements that preceded my client's confession were not omitted. The jury poll was not an accurate reflection of society and the Supreme Court's view of fair selection of society. Well, when you say an accurate reflection, it may have been an accurate reflection because, percentage-wise, there aren't that many blacks in this county. So would it be more fair to say that it was unfair rather than inaccurate or inaccurate? Well, I would say zero is not fair. That's what happened here. We had zero. My understanding of the record is there were no African Americans in the jury poll. And I understand you as well as myself are a bit hamstrung by the lack of statistics that were produced by the trial record. But nevertheless, zero doesn't need interpretation. In and of itself, it says something. It means that there was no representation. Turning to the due process argument in regards to the identification, the Supreme Court has said that if an identification is so unnecessarily suggestive that it leads to a mistaken identification. A defendant's rights can be deprived of due process. Does the defendant deny that he was given a chance to place himself in the lineup to be viewed and he took the middle position? His contention below, which I did not focus on in my briefs, was that he was denied his place in the lineup and that made it unnecessarily suggestive. That was one of the arguments. The second argument, which I focus on in my briefs, is that the clothing that they wore was unnecessarily suggestive in that they all had orange jumpsuits on except my client had an orange jumpsuit on but didn't have a blue wristband. Now, that wristband is similar to a hospital wristband, right? Correct. Which means it's about an inch maybe in width at the most. Is that right? It's probably similar to the size of my watch here and it's a colored blue. Okay, so like a watch band. Sure. Okay. And my contention is that the State has to concede that's suggestive. The only question is whether there was an other indicia of reliability. Why does it have to include a suggestive? Because the State is using these armbands to differentiate people. That's why they're using it. They can't state that they're using these armbands to differentiate people for prison and say, well, for purposes of identification and lineup, it's not used to differentiate people. Now, isn't the issue actually whether it was unduly suggestive? Correct. Right. So if it's a little bit suggestive, there is a spectrum there, right? It can be a little bit suggestive. It can be a lot suggestive. I agree that there's a spectrum and I don't contest that everybody has to look identical. However, I did watch enough Sesame Street with my son to know that this is a case where it's not difficult to understand. One does not look anything like the other. Well, they don't have to look identical, right? I didn't say identical. I said one has a different, doesn't look anything like the other in that they don't have a blue wristband. Now, the witness who viewed them, she actually had them, I believe it was stepped forward, right, so that she could see their face. She didn't ask to look at their arms, right? Well, my contention would be the fact that she had to have them come closer makes the suggestiveness of the armbands even more relevant because she couldn't just look at them and say, that's the one. She had to have them look closer. She had to have them move closer. And there's suggestions in the record that she looked at pictures of the accused before the lineup. And then we could go to the actual identification. Wait, don't we want the identification to be reliable? Yes, we do. And if she saw this person that she's identified as one of the persons involved at a reasonably close perspective, why is it so unusual that she would want them to step forward so that she could see what she might have seen on the street that day? Well, I could recognize all your faces, and I don't have glasses. Well, we're very recognizable. I know. We're all lovely looking judges as judges go, but I'm saying, which one of us does not like the other? That's a trick question. She doesn't. That's true. That's true. But she didn't say she wanted to see their bodies. She wanted to see their faces, which is what she claimed and testified that she saw as they were leaving the, what, Radio Shack or whatever it was? True enough, and part of this analysis is whether or not she's credible, but it's not just positive. We also have to look at the actual, the initial identification itself. And what happened was she saw the accused in the parking lot for a matter of seconds. Nothing was happening at that time for her to think that my client, allegedly my client was, that there's something about his face or demeanor that she should remember. It was just two men walking, and she said, well, he walked by. I walked by people on the way to this courthouse this morning with a light. I could not, I wouldn't be able to know what the faces or identify them in a lineup if something happened here and it came out that I may have crossed paths with them. There was nothing traumatic about the experience in the parking lot where she would have taken note of that person's appearance. Weren't the two of them carrying something? They were carrying a garbage pail or a garbage can. Nevertheless, if I saw somebody outside of the building in a strip mall with a garbage pail, I wouldn't think twice about it. Maybe if someone was walking through somewhere where it would be out of place, like Nordstrom's or something, or even when I can't think of a place where it would be terribly out of place to have a garbage can, maybe a surgical room. But there's nothing about the incident itself that would have caused her to take particular note of the defendant's features. And how long did she say it took, I think, the manager to come running out? Was it an hour? Was it minutes? Was it seconds? It was not long at all. It wasn't hours or minutes. It was probably less than a minute. And would you consider that to be remarkable based upon what he said he said, he testified he said? I would say that regardless of that encounter, even if someone ran out of the store, you know, screaming with their arms waving and I don't know. It doesn't matter how traumatic that the person running out of the store is because she had already seen the person. That time had already left. So it doesn't matter how traumatic the experiences are after the initial identification. It matters what was going on when she looked at these people. And there was nothing out of the ordinary, according to her, about these two people. But now there is something out of the ordinary. Correct. Are you saying that we can't take into account or a jury can't take into account that she has a memory and she can put two and two together and go, oh, wait a minute? I'm not saying that you have to discount that someone has a memory. I'm saying that you have to take into account human nature. And if you're walking by somebody in a parking lot and you have no reason to make an account of what they look like and there's nothing traumatic going on, what happens after the event doesn't make the initial identification any more reliable. That's what I'm saying. But that sounds like an argument that should be made to a jury, right, to a fact finder. Because those are all factors that go into the, I guess, the quality, in a sense, of the identification, right? Well, I would argue it's part of the analysis that this Court has to undertake, too. If it gets to the initial threshold that the identification is unnecessarily suggestive. And I suggest... Does the fact that he confessed diminish the probability that prejudicial error occurred? No, because as I'll get to in my second argument, I don't think that the confession was properly introduced. I think it has its own problems because of the completeness doctrine. Because why? Because of the completeness doctrine, Rule 106, according to Rule 106, which codifies the completeness doctrine. If it is fair... As I understand your argument, if there are three or four or five conversations, interrogations, interviews with the State, and in the first four the defendant denies the charges, but in the fifth one he admits it, do you believe completeness requires that the other four denials should be put into evidence as well? Is that correct? Or am I misinterpreting your argument? Well, the State, it sounds a little bit like your argument, suggests that you cannot introduce prior statements just because they're contradictory. And I agree that, at least in terms of the common law doctrine, that's the case. But we wouldn't be introducing it solely because they're contradictory. We would be introducing them to understand why this person changed his tune from the first three interviews to the last. What were the police interrogation techniques used during that time? What was his demeanor? He wanted to provide some context for this final statement. And that's the whole purpose of Rule 106 and completeness doctrine. I'm interested in putting in the prior statements, establish the why, as opposed to something other than mere disagreement. Okay. Or inconsistency or contradiction. Okay. Well, as I mentioned in the brief, it is the State's obligation to record these. And the State did not record them. And that's Code Section 14-3Q1 of the Criminal Code. And that is, if it was recorded, we could have had more of an idea of what the demeanor was of the accused and what police investigatory tactics were used. And what rationale was being used and why he would change his confession from the first three times to the last. Well, based upon what you know as contained in the record, how would his prior statements establish the why? Because what your response was, was rather speculative based upon a hypothetical presumption that knowledge is power. And, frankly, we don't know what would have been provided or established if they had done those things. So it's rather presumptive and speculative to assume that any information that was gleaned through the procedures that you've listed would necessarily explain the why. We don't know because they failed to follow the law of Section 14.3 of the Criminal Code. And so what we're now saying, or perhaps what you're suggesting, Your Honor, and I may not understand it completely, but because we don't know, we're supposed to infer that there was an innocent, that there was nothing malevolent or nothing untoward or outputting about the prior interviews. And I would think that the Constitution affords our citizens the presumption that they should be entitled to see what – they should be entitled to context in the case of confessions. The truth needs to be outed when someone is put in prison for 20 years for a confession. Okay. Thank you. Your time is up. You'll have an opportunity to make rebuttal. Thank you, Your Honor. Mr. Lupa? Good morning, Your Honors. Good morning. My name is Stephen Lupa, and I'm an Assistant State's Attorney in DuPage County. I'm here today on behalf of the appellee, the people of the State of Illinois. Your Honors, the defendant presents four distinct issues from four different stages of the trial process, but all four issues share one thing in common. They are without merit and do not require reversal in this case. We would instead ask you to affirm the judgment below based on the reasons stated in the appellee's brief. I'd like to focus my attention first on the argument that the lineup was unduly suggestive in this case. As Your Honors have noted, the members of the lineup need not be physically identical. And in our brief, we cited three different cases, and in each of those three cases, there was something distinct about the defendant. In the Joyner case, the defendant was the only person with braided hair. In the Kubat case, the defendant was the only person wearing glasses. In the Johnson case, the defendant was the only person wearing red pants, which, I might add, were the same pants that were worn at the time of the robbery. Wasn't there a case where somebody was the only one that wore glasses, had dreadlocks, and wore red pants? I'm not familiar with that case, if there is, Your Honor. But certainly, each one of those characteristics in and of themselves speaks for themselves. And in each of those cases, the court held that the lineups were not unduly suggestive. And I think that those cases apply to this case, and I think they have great force here. Judge Guerin noted that all of the participants of the lineup were the same race. They were the same apparent age. They had similar hair. They were similar in weight. They had similar complexions. Similar, yes, Judge, Justice McLaren, they had similar races. They were all wearing orange jumpsuits, and they all walked to the glass in unison. There's no requirement that they be physically identical. And as Judge Guerin noted, reviewing a photograph of the lineup, the blue wristband was not something that stood out. On page 380 of the record, he states, I don't think that that would be obvious to anyone. Is there anything in this record that indicates why, although he's in a jumpsuit, he doesn't have his wristband yet attached? I believe the record is silent as to that, Your Honor. My guess would be he had just been booked into jail, and he hadn't undergone that part of the process yet. But it is not part of the record. Had he been charged yet? Because if he hadn't been charged, he wouldn't have a wristband, right? That's true as well, Your Honor. I don't believe he had been charged at that point yet, which would be another reason. Was there any record that indicated what the significance or the meaning of the wristband was? I believe the detective testified that it had something to do with identification, the identification of the inmates who had been booked in DuPage County Jail, perhaps medical information or a barcode or some way that prison or jail personnel could identify the inmates. But regardless of why they had the wristbands or why they did not, there was nothing that was unduly suggestive about the lineup. And that's only the first part here. The defendant also has to show that if there was undue suggestiveness, that it tainted the lineup. And the identification here was not tainted. The witness, Ms. Candelupo, very clearly testified that her identification was based solely on the defendant's face and height. And she said at page 368 that she had very good face contact. Is it reasonable to conclude that if someone has a wristband, that someone could not have committed a crime because they were in jail? Or is that as speculative as assuming that the charge was based upon an act or acts for which this person could or may or may not have been in jail and therefore unable to commit the crime? Justice McClaren, I'm sorry. I'm not sure I understood the question. Well, the syllogism that is being presented is that the wristband is some sort of evidentiary proof that there is a distinction to be made between the various members of the lineup. And the question then becomes, what is the distinction that supposedly makes this individual noteworthy? And unless you can establish that it relates to the idea that this person could not have committed the crime or was the only one who could have committed the crime because everybody else had wristbands and therefore they were all in jail at the time of the alleged offense. But I don't know that there's sufficient evidence in the record to establish either conclusion. Well, and Justice McClaren, you're correct. There's no evidence in the record that Ms. Cantaloupo knew what those wristbands were for, what they symbolized, what they meant. There was no testimony as to that at all. And regardless of whether it's not... Or whether they were incriminating or immaterial. Correct. There was no evidence one way or the other. She didn't even notice the wristbands based on her own testimony. So I don't think that she... Is that what she said? I'm sorry? Is that what she said? Does she... I believe she said that near 368, that she... She said she knows herself well enough and she knows that... Or is fairly certain that she did not notice the wristbands. And to Justice Hutchinson's point, Justice Hutchinson, you were asking Mr. Lowarchuk about the circumstances of the identification in the parking lot. There was more than what was discussed as to what would have made this initial observation noteworthy. Justice McClaren, you noted that... I'm sorry, Justice Hutchinson, you noted that the store customer came out screaming within seconds, we've been robbed, we've been robbed. But Ms. Cantalupo also testified that the defendant smiled at her. That is part of the record. That is something that caught her attention, not just the garbage can that they were carrying between them. But the defendant made a point and smiled at her, and she smiled back. So that is... They made eye contact, didn't she, sir? Yes, Justice Spence. So these are additional facts that, under the totality of the circumstances, again, lend support that this actually was something that stood out to her. But in the end, based on the standard that must be satisfied here, the defendant below and here on appeal did not make a showing that the lineup was unduly suggestive. Let's talk a little bit about the completeness doctrine, if we could. Yes, Your Honor. Although the motion in limine to not allow those denials into the record was granted, was the defendant allowed to, at the state as well, talk about the fact that he had been in custody for a while and had been questioned several times? Judge Guerin did allow, and he mentioned this in his ruling, he did allow the defense to bring out the fact that he had been interviewed a certain number of times. They were allowed to bring out when those interviews occurred, being the day before, you know, the amount of time that went between them. It was solely the content of the interviews, the first three interviews that Judge Guerin barred. So the defense was able to get into those circumstances of the interviews. Had Mr. Jones left the police department from the time he was picked up until the time he was charged? Is that related in the record? Because it is over a two-day period, give or take. Judge, it is not related in the record, and it doesn't, I don't believe it appears in the motion in limine. However, I think that, so the first three interviews happened on the same evening, and then the second one was the next day, 19 hours after the first three. I think it would be fair to infer that he had left the, he had not left the station. But regardless of whether he left the station or not, there was enough attenuation between the first three interviews and the final interview to where it was indeed a separate conversation. Should this interview have been recorded? Justice, under the statute at the time, I don't believe that the interview was required to be recorded. Defense counsel below did concede that point at record 1770. He stated that if the interview was conducted now, that the statute would require it. But back then in 2013, he conceded at 1770 that, well, it may not have been required at that time. And I believe he was correct that the interview was not required to be recorded. It was there evidence that DuPage County was in fact conducting interviews that were recorded during that period of time, even though not required to? I don't think that's a record, Your Honor. And to the issue of the recording, Mr. Lowarchik kind of hung his hat during the argument on Rule 106. The text of Rule 106 is clear. It begins when a writing or recorded statement is introduced. That is a prerequisite for Rule 106 to apply. The statement that the people must introduce must be a statement that is in writing or recorded. If we don't have that triggering circumstance, the rest of the rule does not apply. And in this case, regardless of whether it was recorded or not, the state did not seek to introduce a statement like that. So Rule 106 does not apply. And the court can end its analysis there if it chooses to do so based on the plain language of Rule 106. Also going to the common law exception, which Mr. Lowarchik mentioned, the Cragen case, which was decided by this court, makes clear that it has to be the same conversation. And as we've discussed and I cited the Brown case, which held that a gap of one hour between two conversations was enough such that the completeness rule was not triggered and did not allow the statements. Here we have a gap of 19 hours. Certainly, these are separate conversations. And regardless of the triggering circumstances of the common law or Rule 106, neither one applies because, as Justice McClaren pointed out, the denials merely contradicted the later admission. It did not explain them. I would argue it did not explain them. It did not shed light on them. And Justice McClaren, you also noted that we don't know the exact contents of those statements, that those were never made a record. That might be something that could be raised on post-conviction review, but without the exact content of the statements, based on the record before us, those denials merely contradicted. They did not explain anything. In other words, there was no offer of proof. Correct, Judge. There was no offer of proof. They talked a little bit about the statements, but there was no formal offer of proof or proffer of anything like that made. Does the issue of prior consistent statement based upon a recent fabrication ever get implicated in situations like this? Maybe it's a hypothetical speculation, but I can see where somebody might argue that this was recently fabricated. Certainly that argument could be made, and it might apply in some circumstances where the record would support it, but that is not the case before this Court. At least it wasn't raised here. Correct, Your Honor. Correct. Your Honors, unless the Court has any further questions or would like to focus on any other issue. What about the composition of the jury? Let's talk about it from the State's perspective. Certainly, Your Honor. Justice Hutchinson, our perspective is at the threshold, the issue has been waived. It was objected in the trial court below, but the defendant did not raise it in any of his three motions for a new trial. It is completely absent, so the Court must review it for plain error. But even if we get to plain error, there was no error occurring in this case. I think the line that I quoted from Holland v. Illinois is significant. It says the Constitution does not demand a representative jury. It demands an impartial one, and that is a fair cross-section case. So as I cited in my brief, the people v. people's case, there are three elements that must be shown in order to have the fair cross-section claim. There's the distinct group within the community, that the group is underrepresented and is not fair and reasonable with respect to the number of people in the community, and that that group of people have been systematically excluded from the jury selection process, and that is the defendant's burden. Well, at the time the actual complaint, as it were, was made that this was not a representative jury, it is when the available jurors came into the courtroom and it appeared that there were no persons in that group that would be considered a racial peer to the defendant, correct? Yes, Your Honor. And no other potential jurors came in, and so that was the only time we heard the objection. Is that correct? Correct. And Judge Guerin gave defense counsel plenty of opportunity to make an offer of proof, present additional facts, statistics, if he chose to do so. He asked Mr. Montwiler if there was anything further on at this point, and Mr. Montwiler responded no. It's – there was no showing, there were no facts or evidence proffered here or below. The standard isn't even cited in the appellant's brief. So for those reasons, Judge, there was no plain error, there was no error whatsoever. And as another justice noted, based on the – well, I'll stop right there. If there are no further questions, the people would ask you to refer the judgment below. Thank you for your time. Thank you. Mr. Luarchik. Mr. Luarchik – oh, sorry. Go ahead. I don't want to throw off your train of thought here, but if we could talk just basically about this racial composition of the jury. Was there – you said that, as Justice McClaren was, you too were sort of hesitant about the fact that we didn't have any facts in the case about the composition of the population of DuPage County versus this jury. Was anything ever represented to the court about, you know, the racial composition of the county of DuPage? Well – Other than everybody walked in and they appeared to be white. Other than zero, there not being a single African American in the poll, no. And normally I would say that that's the end of the discussion, but you could take judicial notice of the obvious, and zero is representative of nothing. And if you've lived in the community, as I have and I know you all have, you know zero is not representative – Well, if we're going to take judicial notice of the obvious, what is the obvious in your opinion? The obvious is that the pool taken is not representative of the public of DuPage County. And I would agree to an extent with the state's analysis that the panel ultimately chosen does not have to be representative. However, the pool in the Holland case does have to be representative. Why? Because the court says that that is part of the process of ensuring that the ultimate panel that is chosen is fair. So what about the third factor, that the underrepresentation is due to the systemic exclusion of the group in the jury selection process? Again, that – we only have to go on the record. However, I think anyone who takes history in high school class knows that African Americans have been – Well, is there anything in this record to show how the pool is selected? I mean, we generally know from the law how they're selected, but is there anything in this record that specifically says DuPage County did not look at – voting records did not look at, driver's licenses did not look at, things that are otherwise commonly used to try to get jurors to come to the courthouse? No, the trial counsel did not present that. However, you are privy to the law, as you said, and he doesn't have to cite anything there, because the Supreme Court, in terms of law, the Illinois Supreme Court has said that courts have to take judicial notice of Illinois statutes and constitutional provisions when fairness so requires, even if the defense counsel doesn't raise it. And that case would be the Elmo v. Condit-Cook. It was a 1991 Illinois Supreme Court case. Going back to counsel's argument, Judge, you mentioned the syllogism, which got me excited because I enjoy logic, and it was in the context of the identification. So in this case, the analysis, the major premise is that unduly suggestive lineups deprive the defendant of due process of law. Minor premise was that his arm band was unduly suggestive. Conclusion, he was deprived due process of law, unless there's an exception, which would be other indicia of reliability. As far as I'm concerned, all of the case law that the State presented, as far as lineups with one person having glasses and another person with someone having red pants and a different person having a hairstyle, that's all irrelevant because the State put something on these people that it must admit as a means of identifying them, of making them different from the public. And I would disagree that it's not unnecessarily suggestive. We know that if we see someone with an arm band, it means they belong in that facility. They are imprisoned there. They could also mean that they were at a party the night before. They were at Great America where they had wristband nights. All four of them? It could be. But that's not logical. If I'm walking in a hospital and I see someone with a wristband, I assume they either work there or they're a patient. If I'm in a water park and I see somebody with a wristband, I assume they either are working there or paid admission. In this case, they were all wearing wristbands, and it doesn't require Sherlock Holmes' intellect to deduce that that means four of them belong in that jail, meaning they were already convicted of a crime. One did not. So the question thereafter becomes whether or not there are other indications of liability for this person's identification. I don't think smiling at somebody makes identification any more reliable than if the person had looked away furtively. In fact, if the person at issue didn't look at the eyewitness, it would have been more suggestive of guilt, and the person would have paid more attention here. The eyewitness indicated that the person she viewed did what everybody does when they, at least in front-liner parts of the nation, they smile, make eye contact. There's nothing unusually suggestive about that. Well, your time's up. You may close if you would like. In sum, Your Honors, I started my argument by saying that the purpose of criminal procedure is to ensure that the wrongfully accused do not get convicted. It is a ghost that haunts the criminal justice system, as Leonard Hand said in one of his opinions. Leonard or Learned? I'm sorry? Did you say Leonard or Learned? I meant to say Learned. Sorry. He's the only person that I know that has a hand that is smarter than himself. And I don't think in this case we could assuage Mr. Hand's fears. Thank you, Your Honors. Thank you. We'll take the case under advisement for re-assurance.